Filed 2/10/15  P. v. Pompa CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

          v.

MARIO RIVAS POMPA,

    Defendant and Appellant.

G050441

(Super. Ct. No. RIF1202010)

O P I N I O N

Appeal from a judgment of the Superior Court of Riverside County, Charles J. Koosed, Judge.  Affirmed.

Christopher Nalls, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting, Tami Falkenstein Hennick and Junichi P. Semitsu, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

A jury convicted defendant Mario Rivas Pompa of attempted murder (count 1), and five counts of assault with a deadly weapon, to wit, a car (counts 2 through 6). The trial court sentenced defendant to 13 years in state prison.

Defendant contends the court's failure to give a unanimity instruction constituted prejudicial error and that insufficient evidence supported the assault with a deadly weapon counts. We disagree and affirm the judgment.

FACTS

After 25 years of marriage, Imelda Pompa divorced defendant due to his cocaine addiction and refusal to seek treatment. She moved herself and their four children and granddaughter out of the family home into an apartment.

Unless Pompa saw defendant was under influence of drugs, she allowed him to help care for their youngest son. On the morning he committed the charged crimes, defendant threatened Pompa that she would lose her home, kids, and job if she did not allow him into the apartment. When Pompa refused to let him take their youngest son, defendant said that would be the last time she hugged him.

Around 10:00 p.m. that evening, defendant returned to Pompa's apartment complex where Nakita Manai was sitting in her car. Defendant smashed his car into Pompa's parked car, pinning it against a tree. Manai had never seen defendant or his car before and began driving away. Defendant followed and struck the back of her car. Manai pulled over to the side of the road, thinking she "was just in his way." But defendant came at her fast and looked like he was going to hit her so she pulled out onto the road and pressed on the gas. Defendant rammed her car two more times. When Manai slowed down for a sharp curve, defendant clipped her back bumper causing her car to flip over a curb and roll several times onto a grassy area.

2

Manai blacked out from the crash and woke up lying on the grass outside her car, which was on its side with the engine still running. Manai jumped up, scared. She saw defendant had turned his car and was "driving directly towards" her, "trying to jump the curb with his car" about three or four times. If defendant had not turned his car toward Manai, his car would not have been hitting the curb. Manai was afraid defendant was going to run her over. Defendant eventually drove away. The distance from where defendant started chasing Manai to where her car rolled over was "[p]robably around a mile and a half." The entire incident occurred within three or four minutes.

Defendant then drove back to Pompa's apartment complex. After circling the parking lot while yelling loudly, defendant drove over the sidewalk and "hit[] the apartment with his car," knocking down the front door. The impact caused the dead bolt to break the doorjamb and the wooden frame. The part of the door with the handle "was gone." Defendant's teenage son was in the living room "right next to the front door" when defendant smashed through it. Pompa and the rest of the family members were in the back of the small apartment, about 15 feet away from the front door. Although defendant appeared to be preparing to crash into the apartment again, he drove away instead.

Defendant testified he had been high on methamphetamine for the four days leading up to the crimes. He was hallucinating, hearing voices, seeing things, and not sleeping.

DISCUSSION

1. *Unanimity Instruction*

Defendant contends his attempted murder conviction should be reversed because the court prejudicially erred in failing to give an instruction, sua sponte, that the jury must unanimously agree on the acts forming the basis for the charge. We disagree.

3

A criminal defendant has a constitutional right to a unanimous jury verdict. When a defendant is charged with a single act, but the evidence shows more than one instance of the charged crime, either the prosecution must select the particular act upon which it relies to prove the charge, or the jury must be instructed that it unanimously must agree beyond a reasonable doubt that the defendant committed the same specific act. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) If the prosecution does not make a selection, the court must give the instruction sua sponte. (*Ibid.*) The omission of a unanimity instruction is reversible error if, without it, not all jurors may have believed the defendant was guilty based on the same act. (*Ibid.*)

Here, the court failed to give a unanimity instruction, and the Attorney General admits "[t]he prosecutor made no clear election of what act o[r] acts he was relying on" for the attempted murder charge. Defendant cites several distinct acts upon which the conviction could have been based: (1) striking the back of Manai's car; (2) speeding toward her car after she had pulled over to the roadside; (3) ramming her twice at high speed; (4) clipping her bumper, which caused her car to flip over; and (5) attempting to "'jump the curb'" with his car. The prosecutor acknowledged any of the acts could support the count.

But "[t]he unanimity instruction is not required when the acts alleged are so closely connected as to form part of one transaction. [Citations.] The 'continuous conduct' rule applies when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them." (*People v. Stankewitz* (1990) 51 Cal.3d 72, 100.) "The 'continuous course of conduct' exception—when the acts are so closely connected that they form one transaction—is meant to apply not to all crimes occurring during a single transaction but only to those 'where the acts testified to are so closely related in time and place that the jurors reasonably must either accept or reject the victim's testimony in toto.'" (*People v. Melendez* (1990) 224 Cal.App.3d 1420, 1429, disapproved of by *People v. Majors* (1998)

4

18 Cal.4th 385, 408, to the extent it would require jurors in a murder case to unanimously agree on a theory of murder.)

Here, the evidence showed defendant rammed Manai's car several times and the curb in an effort to drive his car at her within a short period of time (three to four minutes) and a close geographical area (a mile and a half). The acts alleged were so closely connected in both time and place that no unanimity instruction was required.

Defendant maintains the continuous conduct rule does not apply because the act of ramming Manai's car is "significant[ly] differen[t]" from that of hitting the curb, and defense "counsel offered different explanations for both." Defense counsel did not argue the acts did not occur or that they were subject to different defenses. Rather, he asserted at trial that defendant may not have had the necessary mental state required for attempted murder during each act. According to the opening brief, "ramming was not evidence of intent to kill because [defendant] did not know Manai and had no motive to kill her. For hitting the curb, [defense] counsel offered that [defendant] was not actually trying to drive toward Manai at all, and therefore hitting the curb could not be evidence of the intent to even hurt Manai." Defendant thus concludes "the jury could have decided that some acts were done with the intent to kill but some were not."

But the defense underlying both explanations was the same, i.e., that defendant did not have the necessary intent. Defendant did not assert a separate defense to different acts or suggest that some occurred while others did not. Rather, he essentially conceded his conduct but denied he had formed the intent required to impose criminal liability. The jury had no reasonable basis to decide defendant committed some of the acts and not the others. The evidence about each act was of equal probative value, weight, and credibility. If the jury found he committed any of them, it must have found he committed all of them. (See *People v. Riel* (2000) 22 Cal.4th 1153, 1199-1200 [unanimity instruction unnecessary where there was "no danger" a jury would find the defendant committed one robbery but not the other and the defense to both was the

5

same].)  As in *Riel*, "this *is* 'a case where the jury's verdict implies that it did not believe the only defense offered.'"  (*Id*. at p. 1200.)  "Whatever slight differences inhered in the" explanations offered by defendant to the different acts thus "were . . . without significance" and "no prejudice resulted from the omission of a unanimity instruction." (*People v. Stankewitz*, *supra*, 51 Cal.3d at p. 100.)

*2.  Sufficiency of the Evidence to Support Counts 2-6*

Defendant asserts his five convictions for assault with a deadly weapon on his family members should be reversed because insufficient evidence showed he had the ability to commit a battery with his car.  We are not persuaded.

"When a defendant challenges the sufficiency of the evidence, '"[t]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."'"  (*People v. Clark* (2011) 52 Cal.4th 856, 942-943.)

"An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another."  (Pen. Code, § 240.)  The present ability element "is satisfied when 'a defendant has attained the means and location to strike immediately.'  [Citations.]  In this context, however, 'immediately' does not mean 'instantaneously.'  It simply means that the defendant must have the ability to inflict injury on the present occasion.  Numerous California cases establish that an assault may be committed even if the defendant is several steps away from actually inflicting injury, or if the victim is in a protected position so that injury would not be 'immediate,' in the strictest sense of that term."  (*People v. Chance* (2008) 44 Cal.4th 1164, 1168, fn. omitted.)

6

Defendant acknowledges "[a] car can no doubt inflict violent injury under many circumstances." He argues, however, that the prosecution failed to present evidence suggesting it was possible that he was "capable of committing a battery with his car on anyone inside the apartment," including his teenage son, "who was in the front of the apartment." (Boldface omitted.) In his view, the collision only "broke the door and part of the door frame, knocking the door open partway" and the prosecution presented no evidence showing he came close to damaging "the structural integrity of the wall," "the present ability to force his car inside the apartment, or at the very least cause damage inside the apartment that would in turn injure the persons inside." (Boldface omitted.)

But contrary to defendant's version of the facts, Pompa told the 911 operator that defendant had "already knocked the door down." The transcript of the 911 call was admitted into evidence. There was also testimony defendant's teenage son was "right next to front the door." The apartment was small and although the rest of the family members were in the back, Pompa testified they were only about 15 feet away from the front door.

"'Substantial evidence [also] includes circumstantial evidence and any reasonable inferences drawn from that evidence. [Citation.]' [Citation.] We ""presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.""" (*People v. Clark*, *supra*, 52 Cal.4th at p. 943.)

Here, a jury could reasonably infer that defendant had to have been driving at a significant speed in order for him to have knocked down the front door, or to even break the frame. Another reasonable inference is that it was purely fortuitous that defendant's teenage son and other family members were not right behind the front door at the moment defendant crashed into the apartment. Given defendant's testimony he was high on methamphetamine, hallucinating, hearing voices, seeing things, and deprived of sleep, plus the speed he had to have been going in order to break down the front door, a rational jury could find that it was only by chance that he did not crash into an area of the

7

apartment less fortified than a door supported by a doorframe. If that had happened, there was a realistic chance defendant could have also injured family members in the back of the apartment, a mere 15 feet away.

In *People v. Valdez* (1985) 175 Cal.App.3d 103 (*Valdez*), the defendant was convicted of assault with a firearm after he fired three shots at a gas station cashier who, unknown to defendant, was protected by a bulletproof window. *Valdez* rejected the defendant's argument that the present ability element was not established because of the bulletproof glass: "Nothing suggests this 'present ability' element was incorporated into the common law to excuse defendants from the crime of assault where they have acquired the means to inflict serious injury and positioned themselves within striking distance merely because, unknown to them, external circumstances doom their attack to failure. This proposition would make even less sense where a defendant has actually launched his attack—as in the present case—but failed only because of some unforeseen circumstance which made success impossible." (*Id*. at p. 112.) The Supreme Court has found this reasoning sound and reiterated *Valdez*'s conclusion that, "'Once a defendant has attained the means and location to strike immediately he has the "present ability to injure." The fact an intended victim takes effective steps to avoid injury has never been held to negate this "present ability."'" (*People v. Chance*, *supra*, 44 Cal.4th at p. 1174.)

Defendant distinguishes *Valdez, supra*, 175 Cal.App.3d 103, on the basis his family "did not do anything to protect themselves or to escape [his] crash into the door." But the present ability element focuses on the *defendant's* "personal attribute - - what [he] has the capacity to do . . . —not an environmental factor." (*Id*. at p. 111.) It only requires that the defendant "have maneuvered himself into such a location and equipped himself with sufficient means that he appears to be able to strike immediately at his intended victim." (*Id*. at p. 112.) Once those are attained, the defendant has "'the present ability to injury'" and "his culpability is the same" "as if the victim had done nothing to avoid injury." (*Id*. at p. 113.)

8

DISPOSITION

The judgment is affirmed.

                                           RYLAARSDAM, ACTING P. J.

WE CONCUR:


IKOLA, J.


THOMPSON, J.